UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br>  v.<br><br>SHAWN HOLIDAY (4),<br><br>                      Defendant. | Case No. 09cr3393 BTM<br><br>**ORDER DENYING MOTIONS TO SUPPRESS AND MOTION TO DISMISS** |

Defendant Shawn Holiday ("Holiday") has filed motions to suppress evidence in addition to a motion to dismiss. For the reasons discussed below, Holiday's motions are **DENIED**.

## I. FACTS

The Court held an evidentiary hearing on defendant Holiday's motions to suppress evidence on July 19 and 26, 2010, and August 2, 2010. Holiday seeks to suppress all evidence seized from him and the fruits thereof, contending that he was arrested without probable cause. The government contends that Holiday was arrested based on probable cause to believe he had distributed crack cocaine to Yukon Branch, who sold it to a confidential source ("CS"). The Court heard testimony from several law enforcement officers, all of whom the Court finds credible. Based on the testimony and evidence presented, the Court finds that the law enforcement officers were aware of the following facts prior to

1  arresting Holiday, based on their observations and the legitimate inferences therefrom.

2  DEA Special Agent James Higgins and several federal and state law enforcement officers were conducting controlled buys of cocaine and methamphetamine in San Diego during the summer of 2009.  Agent Higgins was utilizing the CS to purchase drugs from Yukon Branch.  Prior to September 16, 2009, under the agents' surveillance, the CS made four to five controlled purchases of substances from Branch that tested positive for cocaine and methamphetamine.  Holiday was not observed in connection with any of these sales.

8  On September 16, 2009, the CS was to meet again with Yukon Branch to purchase crack cocaine and later methamphetamine in two separate transactions.  The sale was to take place in the neighborhood of Imperial Avenue and 50th Street, San Diego, California, in an alley behind Branch's apartment building.

12  Imperial Avenue runs east/west in that area, and 50th Street runs north from Imperial.  On the northwest corner of Imperial and 50th is a self-service car wash.  To the west of the car wash is a taco stand.  Branch's apartment building is one block north of the intersection of Imperial and 50th Street.  The actual street address of the apartment building is on Willy James Boulevard.  An alley runs east/west directly south of the apartment building.  The car wash property abuts this alley.

18  During the morning of September 16, 2009, Agent Higgins and his colleagues met with the CS and searched him and his vehicle to make sure no drugs were on his person or in his vehicle.  They wired the CS so they could monitor his conversation with Branch and provided pre-recorded currency to him for the transaction.

22  At about 11:00 a.m., the CS drove into the alleyway behind Branch's apartment building.  About ten agents and law enforcement officers took up surveillance of the area and communicated their various observations over the radio.  Agent Higgins monitored the CS.

25  Yukon Branch came over to the CS's vehicle and spoke to the CS.  Branch suggested that the CS give him half of the money for the transaction.  Branch would then take the money to his source, who was nearby, and return with half of the cocaine.  The CS agreed with this procedure.

1    At some point around the time that Branch was to meet with the CS, the agents observed a black Lincoln Navigator pull into one of the stalls of the car wash. The driver, later identified as Holiday, did not wash his vehicle but remained in the car wash stall for about ten minutes.

5    Branch left the CS and was observed walking south on 50th Street, entering the car wash, and walking over to the Lincoln Navigator. There, Branch spoke to the driver, who was standing to the rear of his vehicle. Branch then returned to the CS and told the CS he needed all the money or the CS wasn't going to get the cocaine. The CS gave him the balance of the $8,000. Branch then walked back to the car wash and met again with the driver of the Lincoln Navigator.

11   Branch told the CS that both of the suppliers for the two deals were in the car wash. The CS believed that one of the suppliers was in a white car and that the other was in another car. (Ex. B, audio of undercover meeting.) The CS informed Agent Higgens of this over the cell phone when Branch went to meet his supplier.

15   The agents could not see anything exchanged between the driver and Branch. However, after this second encounter, Branch returned to the CS. After a brief conversation, Branch departed.

18   The CS told the agents that he thought the supplier was in a white car.

19   Agent Higgins then called the CS on his cell phone, and the CS advised him that it was a "good deal." Higgins testified that he put out a radio alert, stating, "It's a good deal. Let's get them stopped," meaning the agents were to follow and stop the Lincoln. Higgins arranged to meet the CS to retrieve the cocaine about a quarter of a mile from where the transaction took place.

24   Meanwhile, the agents observed the Lincoln Navigator pull out of the car wash, without it being washed, and make a right turn on Imperial Avenue. The vehicle then pulled alongside the taco stand, where a person, identified as Nicolas Sibley, who had just ordered food, came over and spoke to the driver. The Lincoln pulled into the taco stand parking lot, and Sibley got in and spoke to the driver. Sibley then went and got his food, returned to the

Lincoln, and reentered the vehicle. After a short period, Sibley got out of the Lincoln and got into his white car. Both Sibley's vehicle and the Lincoln departed the taco stand and headed west on Imperial to Interstate 805. The Lincoln went north. Sibley went south.

By this time, Agent Higgins had met with the CS and received the substance that the CS had purchased from Branch. From his experience, Higgins recognized the substance as cocaine. Agent Higgins received the cocaine from the CS before the Lincoln and Sibley's vehicle departed from the taco stand. The agents and local police officers followed both the Lincoln and Sibley's vehicle and effected a stop of the vehicles. Agent Higgins participated in following the Lincoln Navigator after he received the cocaine from the CS. Holiday, the driver of the Lincoln, was ordered out of the vehicle, handcuffed, and placed under arrest.

On September 18, 2009, a Complaint was filed against Holiday and other defendants. On September 23, 2009, a Grand Jury returned an indictment against Holiday and other defendants.

## II. DISCUSSION

Holiday seeks to suppress evidence and dismiss this case on the ground that he was arrested without probable cause. In response, the government contends that based on the above facts and the legitimate inferences from these facts, the agents had probable cause to believe that Holiday was the source of the cocaine that Branch delivered to the CS. The Court agrees with the government.

Under the collective knowledge doctrine, courts must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by "look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually undertakes the challenged action." United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007) (internal quotation marks and brackets omitted). As long as there is some communication among the agents, the collective knowledge doctrine may be applied "regardless of whether any *information* giving rise to

probable cause was actually communicated to" the officer conducting the stop, search, or arrest. Id. at 1032 (internal quotation marks and brackets omitted).

Here, there was some communication among the agents, and it is clear that the officers were working together as a team. Therefore, the Court applies the collective knowledge doctrine. Aggregating the facts known to each of the officers involved, there was collective knowledge that: (1) the CS had purchased crack cocaine from Branch on several prior occasions; (2) the CS had arranged to purchase crack cocaine from Branch on September 16, 2009; (3) after the CS met Branch at the sale location, Branch asked the CS for half of the money, and after receiving the money, walked to a black Lincoln Navigator parked at a nearby car wash; (4) Branch told the CS that both suppliers were at the car wash; (5) after speaking to the driver of the Lincoln Navigator, Branch returned to the CS and said that the CS needed to give him all of the money in order to get the drugs; (6) upon receiving all of the money, Branch once again walked to the car wash and talked to the driver of the Lincoln Navigator; (7) the driver of the Lincoln Navigator never washed the car during the ten minutes or so that the car was parked in the car wash stall; (8) Branch walked directly from the Lincoln Navigator back to the CS; (9) Branch handed the purchased drugs to the CS; (10) the drugs appeared to be cocaine; and (11) Holiday was the only person in the Lincoln Navigator and the only person who met with Branch before the cocaine was delivered to the CS.

Probable cause to arrest exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007). Alternatively, the Ninth Circuit has defined probable cause as existing when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." Id. Based on the aggregate facts known to the officers, the officers had knowledge sufficient to lead a person of reasonable caution to believe that an offense had been or was being committed by Holiday. Specifically, the aggregate facts

gave rise to a reasonable inference that Holiday provided the drugs to Branch, who then provided the drugs to the CS. Accordingly, Holiday's arrest was supported by probable cause.

United States v. Ingrao, 897 F.2d 860 (7th Cir. 1990), a case upon which Holiday relies, is distinguishable. In Ingrao, Ingrao was arrested after he was seen near one of the residences of the subject of an FBI narcotics investigation. There had been some suspicious activity at the location before and after Ingrao was observed there. However, there was nothing tying Ingrao to the suspicious activities on the scene, and there was no evidence that Ingrao had any ties to the subject of the FBI investigation. Here, in contrast, there is specific evidence linking Holiday to Branch and the drugs that were sold to the CS.

In addition to arguing lack of probable cause in general, Holiday also challenges his arrest on the ground that probable cause was not set forth in the Complaint. However, as set forth above, based on the evidence presented at the evidentiary hearing, the Court has determined that the agents had probable cause to believe that Holiday had delivered cocaine to Branch who then delivered it to the CS. Thus, at the time of his arrest, there was probable cause. The Complaint, which was filed on September 18, 2009, was not used to obtain a warrant for Holiday's arrest or to otherwise effect his arrest in anyway. Thus any deficiencies in the Complaint do not render Holiday's arrest unconstitutional.

In United States v. Fernandez-Guzman, 577 F.2d 1093 (7th Cir. 1978), the Seventh Circuit explained that the focus of inquiry on a suppression motion should be on the facts known by the officers at the time of arrest, not facts presented in an after-filed complaint. In other words, in the context of a warrantless arrest, the court deciding a motion to suppress should consider evidence regarding the existence of probable cause at the time of arrest and is not limited to the four corners of the post-arrest complaint. Thus, "when the facts known to the officers at the time of arrest are such as to make the arrest constitutional when it occurred, the omission of some of those facts from later-filed . . . complaints cannot make the arrest retroactively unconstitutional." Id. at 1099.

Holiday also challenges his continued detention on what he asserts was a deficient

and incorrect Complaint. But even if the Complaint was insufficient, it did not result in any evidence being obtained against Holiday, and there is no resulting evidence to suppress. Furthermore, dismissal is not warranted because the grand jury indictment of Holiday remedied any defect in the complaint. <u>Denton v. United States</u>, 465 F.2d 1394, 1395 (5th Cir. 1972) (rejecting argument by defendant that his sentence should be vacated due a defective complaint and arrest warrant because "the grand jury indictment of Denton following his arrest remedied any defect in the complaint and arrest warrant.").

Holiday also seeks a dismissal of this case on the ground that he was denied his right to challenge the Complaint at a preliminary hearing. However, because an indictment was returned against Holiday within 10 days of his arrest, Holiday was not entitled to a preliminary hearing. Fed. R. Crim. P. 5.1(a)(2), (c). In any event, even if a preliminary hearing had been held, an evidentiary hearing would have been conducted, leading to the same evidence and the same results as the evidentiary hearing held before this Court.

### III.  CONCLUSION

For the reasons discussed above, Holiday's motions to suppress are **DENIED** and Holiday's motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

DATED: September 17, 2010

*(signature)*

Honorable Barry Ted Moskowitz
United States District Judge